UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| WAYNE LAFERRIERE, <br><br> Plaintiff, <br><br> v. <br><br> DEBBIE MEIER, *et al.*, <br><br> Defendants. | Cause No. 1:24-CV-006-PPS-APR |

**OPINION AND ORDER**

Wayne LaFerriere, a prisoner without a lawyer, moves for a preliminary injunction requiring that he be provided with medication and other care for epilepsy and injuries he suffered in a fall while in the custody of the Huntington County Jail. [DE 5.] I ordered a response to the motion by Jail Commander Debbie Meier, which has now been filed. [DE 15.]

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

On the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a

mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted). In assessing the merits, I do not simply "accept [the plaintiff's] allegations as true" or "give him the benefit of all reasonable inferences in his favor, as would be the case in evaluating a motion to dismiss on the pleadings." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). Instead, I must assess the merits as "they are likely to be decided after more complete discovery and litigation." *Id.*

On the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Mandatory preliminary injunctions—"those requiring an affirmative act by the defendant"—are "cautiously viewed and sparingly issued." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Additionally, in the prison context, my ability to grant injunctive relief is limited. "[I]njunctive relief to remedy unconstitutional prison conditions must be narrowly drawn, extend no further than necessary to remedy the constitutional violation, and use the least intrusive means to correct the violation of the federal right." *Westefer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012) (citation and internal quotation marks omitted); *see also Rasho v. Jeffreys*, 22 F.4th 703, 711-13 (7th Cir. 2022) (outlining strict limitations on granting injunctive relief in correctional setting).

As outlined in the screening order, Mr. LaFerriere claims that he is being denied proper treatment for epilepsy and injuries he suffered in a fall while being transported to court by two officers from the Huntington County Jail. [DE 4.] He is proceeding against Nurse Ashley Tinkle on a claim for damages and against the Commander for prospective injunctive relief. *Id.* Although he was initially being held at the jail on a pending probation violation, his probation was revoked on January 29, 2024, and he was sentenced to serve a term of incarceration in the Indiana Department of Correction. [DE 15-2.] Because he is now convicted and serving a sentence, his claim for prospective injunctive relief is governed by the Eighth Amendment.[1] *See Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015).

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove an Eighth Amendment violation, a prisoner must demonstrate (1) he had an objectively seriously medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are

---

[1] I note that some of the events underlying the complaint occurred before Mr. LaFerriere was found guilty of the probation violation, but even if the more lenient Fourteenth Amendment standard applied, he has not demonstrated a likelihood of success in proving that he received treatment that was objectively unreasonable under the circumstances. *See Gonzalez v. McHenry Cnty., Illinois*, 40 F.4th 824, 828 (7th Cir. 2022). As outlined in this Opinion and Order, the care he has received appears more than reasonable. I additionally note that the Commander's response suggests that he is likely to be transferred to an IDOC facility imminently, although it is unclear from the present record when this will occur.

3

they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. Negligence or medical malpractice does not establish an Eighth Amendment violation. *Walker*, 940 F.3d at 965. Instead, courts "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Id.* (citation and internal quotation marks omitted).

The Commander argues that preliminary injunctive relief is not warranted and has submitted Mr. LaFerriere's medical records in support. [DE 15; DE 15-1.] Those records reflect that Mr. LaFerriere was booked at the jail on November 29, 2023. [DE 15-1 at 12-13.] At that time, jail staff completed an initial medical assessment. *Id.* at 21-28. Mr. LaFerriere reported that he had history of seizures, including one nine days earlier, had adverse reactions to numerous seizure medications, currently had blisters from taking seizure medication, and had fainted approximately 12 days earlier. Nurse Ashley Tinkle noted that he had no current order for seizure medication. He reported that the drug Clonazepam had controlled his seizures in the past but made his heart rate dangerously low, and stated that he had last taken it in October 2023. *Id.* at 27-28. Nurse Tinkle sent all of this information to Nurse Practitioner Whitney Simmons (a non-party), who prescribed Lamictal[2] and ordered that Mr. LaFerriere be observed for three days as he started this medication.

---

[2] Lamictal, also called Lamotrigine, is an oral antiepileptic drug. PHYSICIAN'S DESK REFERENCE, Lamictal. *See* https://www.pdr.net/drug-summary/?drugLabelId=206 (last visited Feb. 27, 2024).

4

On November 30, 2023, Mr. LaFerriere refused his morning medication and stated he "does not want [seizure medication] at all." [DE 15-1 at 29.] He did not take any medication for several days, but on December 12, 2023, he told Nurse Tinkle he would like to start back on the medication. *Id.* at 33. The medication was immediately resumed and he took it until December 29, 2023, when he again refused it.[3] *Id.* at 34.

On January 2, 2024, as he was being transported to court, he appeared to suffer a seizure, slid down some stairs, and was taken by ambulance to a hospital. *Id.* at 35-36. Hospital records reflect some inconsistencies, in that Mr. LaFerriere appeared at points to be unresponsive but was capable of sitting down, had a blink reflex, and responded to painful stimuli. It was reported that he "lashed out" at a hospital employee and "began cursing" when he was told that CT scans of his head and spine were normal. *Id.* at 37-44. One doctor concluded, "I do believe the patient is malingering." *Id.* at 41. As he was in the process of being discharged, he asked for x-rays of his neck, back, and hips. The doctor determined that x-rays were not warranted, noting as follows:

> He does not provide a history that would suggest significant injuries at this time noting some soreness after seizures only. When I tried to discuss need[] for films he began screaming and cussing at me and I was no longer [able] to have a conversation. He also reported that he does not take seizure medication currently. I asked him if he would like me to prescribe something [and] he states he will only take what works for him.

---

[3] Records reflect that there was an incident occurring on December 10, 2023, wherein someone claiming to be Mr. LaFerriere's girlfriend called the jail and reported that he was planning to kill himself. [DE 15-1 at 31.] A correctional officer (a non-party) went to speak with him, and he reported that he was not suicidal but was "just upset that his girlfriend was possibly cheating on him." The officer asked to see their electronic communications, which he reviewed and found consistent with Mr. LaFerriere's account. The officer told him that "if he felt concerned at all he can speak with me and we can talk it out as we have done on other matters when he was upset." It was noted that Mr. LaFerriere would be "left upfront" in an observation cell that night. *Id.* Nurse Tinkle also spoke with him after this incident, at which point he agreed to reconsider taking the Lamictal. *Id.*

> . . . and he says clonazepam only. The patient [was] informed [I] will not be able to prescribe that . . . and he dismissed me from the room.

*Id.* at 60. Mr. LaFerriere was then discharged from the hospital and taken back to the jail.

Upon his return, Nurse Tinkle noted the incident at the courthouse and also noted that he had been medically cleared by hospital staff. *Id.* at 70. Her notes were sent to the nurse practitioner, who signed off on them. *Id.* Later that day, Mr. LaFerriere filed a grievance stating that he needed x-rays, had a blurry eye, and could not feel his foot. *Id.* at 72. The following morning, the Commander responded to his grievance and told him he should make his request directly to the medical unit. *Id.* Later on January 3, Mr. LaFerriere refused his medication. *Id.* at 74. He also submitted a medical request seeking x-rays. *Id.* at 75. Nurse Tinkle evaluated him an hour later. *Id.* at 77. Her notes reflect that he "jumped up from laying on bunk, put jumpsuit on, [and] walked unassisted to medical [with] no issues." *Id.* Her notes further reflected that CT scans of his head and spine taken at the hospital were normal, and her evaluation revealed "no noted issued." She told him he might be sore after the seizure. She conveyed this information to the nurse practitioner, who made no new orders. *Id.* That evening, Mr. LaFerriere again refused his anti-seizure medication and continued to refuse it for several days. *Id.* at 78-87. In the midst of these refusals, he filed his civil rights complaint on January 4, alleging that the was being denied medication and proper medical treatment at the jail.

Since the case was filed, he put in additional medical requests for x-rays and also requested to be put back on seizure medication. *Id.* at 90-94. He was scheduled to see the nurse practitioner on January 16, 2024. She ordered a urinalysis, but he was unable to produce a sample. *Id.* at 95. She also ordered x-rays, which were performed the following day and revealed no fractures or dislocations, normal alignment of the cervical vertebrae, and mild degenerative changes of the cervical spine (a preexisting condition Mr. LaFerriere claimed to be aware of). *Id.* at 97-98. She wrote a prescription for 600 mg of Ibuprofen to be taken twice a day for 30 days. *Id.* Nurse Tinkle noted that when she discussed the x-ray results and medication order with him he responded, "This is bullshit; what the fuck?" *Id.* at 95.

In the next few days, he demanded an MRI and reported that the Ibuprofen was not working. *Id.* at 98-99. Nurse Tinkle met with him on January 18 and attempted to discuss the situation but noted that he became angry and began yelling at her, demanding an additional 800 mg of Ibuprofen per day. *Id.* at 99. She told him 1,400 mg of Ibuprofen was an unsafe dosage, but he "was not accepting of answer given." *Id.* Later that day, he filed a flurry of medical requests seeking—among other things— seizure medication, a copy of his x-ray results for his lawyer, and an increase in the Ibuprofen. *Id.* at 100-02. The following day, Nurse Tinkle met with him and reviewed his requests. *Id.* at 103. She noted that he reported that Lamictal caused him "kidney/liver" problems, but no such adverse issues were noted in his records at the jail. He also claimed that the medication gave him suicidal ideations. She conveyed this

information to the nurse practitioner. *Id.* That evening he was moved to an observation cell. *Id.*

Between January 19 and January 25, he engaged in some form of a "hunger strike," refusing certain meals on those dates. *Id.* at 104. On January 21 and 22, he sent medical requests asking for more Ibuprofen and anti-seizure medication. *Id.* at 104-05. On January 26, a mental health provider evaluated him after he reported that he was at risk of self-harm, allegedly from the Lamictal. *Id.* at 107-09. She noted:

> [Patient] appears free of distressed. Currently housed in holding/receiving area without any observable disturbance/abnormalities of functioning. [Patient's] suicide risk evaluated to be minimal. Primary concern at this time is keeping [patient] housed safely. Custody reports no specific concerns at this time. No immediate safety concerns reported by the [patient] or observed. From a [mental health] perspective, general population and precautions appear appropriate. [Patient] is able to attend to self-care activities and has awareness to advocate for their medical and/or mental health needs.

*Id.* at 108.

On that same date, the nurse practitioner referred him to a neurologist for an assessment of his seizures and self-reported adverse reactions to numerous anti-seizure medications. *Id.* at 110. She asked him if he had seen a neurologist before and he reported that he had, but he could not recall where or when he was seen. *Id.* He was referred to Wabash Parkview Hospital to see a neurologist and was scheduled for the first available appointment on March 26, 2024. [*Id.* at 114; DE 15-1 at 10, ¶ 47.] On February 1, 2, and 5, Mr. LaFerriere refused his Ibuprofen. *Id.* at 116-18. On February 5, the nurse noted that when she went to give him his medication he stated, "I'm good." *Id.* at 118.

8

The medical records before me reflect that medical staff at the jail have diligently responded to Mr. LaFerriere's requests for care and have taken his medical needs seriously. He received care at an outside hospital, where staff performed CT scans that were determined to be normal. One doctor opined that he might be malingering. Back at the jail he underwent x-rays which, according to the interpreting radiologist, were unremarkable. Medical staff at the jail have also prescribed him medication to address his pain and seizures, but he has not always been compliant with their orders and has been inconsistent in his desire for anti-seizure medication (which he apparently was not taking regularly at the time of his arrival at the jail). Difficulties have also been posed by the fact that he has reported allergies or adverse reactions to many common seizure medications. He has now been referred to a neurologist for evaluation.

Although he disagrees with various decisions made by medical staff during his time at the jail, that is not enough to establish an Eighth Amendment violation. *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). He has not come close to demonstrating that medical staff are acting with deliberate indifference to his medical needs, or that he will suffer irreparable injury if he is not granted immediate relief before his claims are resolved.

For these reasons, the motion for a preliminary injunction [DE 5] is **DENIED**.

**SO ORDERED** on March 4, 2024.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT